AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
7/8/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: JB  DEPUTY

United States of America

v.

RAZMIK MANUKYAN,

Defendant.

Case No. 2:21-mj-03231-duty

FILED
CLERK, U.S. DISTRICT COURT
07/08/21
CENTRAL DISTRICT OF CALIFORNIA
BY: jm  DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 4, 2021, in Los Angeles County, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/ Angelica Childs
Complainant's signature

Angelica Childs, DEA Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 07/08/2021

Judge's signature

City and state: Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT**

I, Angelica Childs, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Razmik MANUKYAN ("MANUKYAN") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

3. I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed since August 2019.

4. I have received and completed formal training that included a 16-week DEA training program in Quantico, Virginia, including specialized training in the investigation of major narcotics trafficking organizations. I have participated in the debriefing of defendants and informants who had personal

knowledge regarding major narcotics trafficking organizations. Additionally, I have participated in many aspects of drug investigations and conducted extensive surveillance in drug investigations. Through my training and experience, I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am also familiar with the sophisticated methods that drug organizations use to avoid detection by law enforcement.

### III. SUMMARY OF PROBABLE CAUSE

5. In February 2021, the Los Angeles Field Division DEA began working on an investigation of information provided by a Confidential Source ("CS").[1] The CS informed law enforcement that MANUKYAN is a drug broker operating in the greater Los Angeles area. On February 4, 2021, at the direction of law enforcement, the CS made a controlled purchase of 887 grams of actual methamphetamine from MANUKYAN in Los Angeles.

---

[1] The CS began working with the DEA after the CS was caught transporting narcotics in 2020. The CS has been working with the DEA since that time in exchange for consideration of deferred prosecution in that case. The CS has provided information that has been corroborated and proved to be reliable. The CS has seven prior convictions, all for narcotics related offenses. Six of the CS's prior convictions occurred between 1989 and 1998, and the most recent conviction occurred in 2017.

## IV. STATEMENT OF PROBABLE CAUSE

6. Based on my review of law enforcement reports and my discussions with other law enforcement officers, I know the following:

   a. In November 2020, the CS informed law enforcement about a drug broker in Southern California named Razmik MANUKYAN. On January 26, 2021, at the direction of investigators, the CS reached out to MANUKYAN to coordinate the purchase of two pounds of methamphetamine. The CS asked MANUKYAN for "Christina," meaning crystal methamphetamine, and MANUKYAN told the CS that he could get "it" but needed to make a phone call. MANUKYAN asked if the CS was referring to the "white boy," and the CS said no. Based on my training and experience, I understand "white boy" to refer to cocaine. MANUKYAN then asked "how many" the CS needed, and the CS responded by saying "two," meaning two pounds. MANUKYAN informed the CS that he would make a call to a source and would later let the CS know the price.

   b. On January 29, 2021, at the direction of investigators, the CS reached out to MANUKYAN. MANUKYAN informed the CS that the methamphetamine would cost $2,500 to $2,700 a "ticket." Based on my training and experience, I understand one "ticket" to mean one pound. The CS and MANUKYAN agreed to conduct the transaction in the coming days.

   c. On February 2, 2021, at the direction of investigators, the CS reached out to MANUKYAN to arrange the place, date, and time to conduct the narcotics transaction.

MANUKYAN explained that he had heard from his source of supply and that the product was ready to be sold.  MANUKYAN then asked the CS to follow up the next day, on February 3, 2021, to confirm that the CS still wanted to conduct the transaction.  MANUKYAN said that once he got the confirmation, he would arrange to get the product on the evening of February 3, 2021, and have it delivered to the CS on the morning of February 4, 2021.

    d. On February 3, 2021, at approximately 10:01 p.m., MANUKYAN and the CS confirmed the transaction.  In a later phone call that night, MANUKYN asked if the CS was available to conduct the transaction that night, but the CS responded that the next day, February 4, 2021, would be better.  MANUKYAN and the CS agreed to meet in the afternoon on February 4, 2021, in Los Angeles, and the CS told MANUKYAN that the CS would tell MANUKYAN the precise meeting location shortly before the meet.

    e. On February 04, 2021, at approximately 2:15 p.m., DEA Agents met with the CS prior to the planned meeting with MANUKYAN.  DEA agents searched the CS for currency and contraband with negative results.  The CS was then provided devices to covertly audio and video record the planned controlled purchase, as well as $5,400 in cash to purchase the methamphetamine.

    f. Around that time, DEA agents and Torrance Police Department established surveillance around the Ralph's parking lot located at 5800 Obama Boulevard in Los Angeles, which law enforcement had selected as the meet location.  DEA agents then

escorted the CS to the parking lot. Once at the location, the CS waited in the CS's parked car and placed a call to MANUKYAN to inform him of the address for the meeting.

  g. At approximately 3:30 p.m., law enforcement observed a black Chevrolet Suburban, bearing California license plate 8GYE459, arrive in the Ralphs parking lot and park on the driver's side of the CS's car. Surveillance units observed a male, later determined to be MANUKYAN, wearing a black shirt and red pants, exit the black Suburban carrying two burrito-shaped objects and walk over to the CS's car. MANUKYAN then got into the CS's car on the passenger side and closed the door. While inside the car, MANUKYAN handed the CS the two objects and the CS provided MANUKYAN with the $5,400 in cash.

  h. At approximately 3:33 p.m., law enforcement observed MANUKYAN exit the CS's car and walk back to the black Suburban. At approximately 3:34 p.m., MANUKYAN departed the parking lot and mobile surveillance ensued. After observing a traffic violation, officers of the Glendale Police Department stopped MANUKYAN and asked for his consent to conduct a K-9 search on his car. MANUKYAN consented to a K-9 search, and a search was conducted. The K-9 alerted to the odor of narcotics on a blue leather backpack that was lying on the floorboard of the car. Based on that alert, law enforcement opened the bag and found $47,471 of currency inside the backpack, wrapped in rubber bands.

  i. At approximately 3:36 p.m., law enforcement escorted the CS back to a neutral location and took possession

of the methamphetamine. Agents then searched the CS and the CS's car for any additional contraband, with negative results.

    j. At a subsequent debrief, the CS said that MANUKYAN explained that the prices of crystal methamphetamine would be cheaper if the CS bought the product in bulk. The CS asked MANUKYAN how many pounds the CS would need to buy for the price per pound to be lower, and MANUKYAN said ten. MANUKYAN also told the CS that he would check the prices for heroin and cocaine.

    k. A later DEA laboratory analysis of the drugs purchased by the CS on February 4, 2021 from MANUKYAN, confirmed it to be 887 grams of methamphetamine.

## V.　CONCLUSION

7. For the reasons described above, there is probable cause to believe that MANUKYAN violated 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __8th__ day of
July, 2021.

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE